[Sac. No. 710. Department Two.— April 24, 1901.]

## J. E. ATKINSON, Appellant, v. ASA CLARK, Respondent.

NEGLIGENCE — FELLOW-SERVANT — EMPLOYMENT OF INMATES OF INSANE ASYLUM — LIABILITY OF MEDICAL SUPERINTENDENT. — The medical superintendent of the state asylum for the insane is not responsible for injuries sustained by a fellow-servant, through the action of an inmate of the asylum, with whom such fellow-servant had worked for several weeks, with knowledge that insane inmates were selected and employed in the same kind of work by subordinate officers of the asylum, in the absence of proof of any negligence of the superintendent in selecting unskillful and incompetent subordinates, or of any knowledge by him that the inmates selected and employed were dangerous or unskillful, or that they in fact were so, or that the accident happened through any unskillfulness of the officers or inmates.

ID. — ABSENCE OF PRESUMPTION AS TO INSANE INMATES. — There is no presumption that the inmates of the asylum were dangerous or unskillful, from the fact alone that they were insane.

APPEAL from a judgment of the Superior Court of San Joaquin County. Joseph H. Budd, Judge.

The facts are stated in the opinion.

A. H. Carpenter, for Appellant.

George H. Buck, and Dudley & Buck, for Respondent.

CHIPMAN, C. — Plaintiff sues to recover damages for personal injuries received through the alleged negligence of defendant in employing an unfit fellow-servant. The cause was tried by a jury, and at the close of plaintiff's evidence upon the issue of defendant's liability, the court granted defendant's motion for a nonsuit, and entered judgment accordingly, from which plaintiff appeals.

The complaint alleges that about September 18, 1895, defendant employed plaintiff as a servant, in the capacity of a carpenter, for a certain compensation; that plaintiff entered into the service of defendant on that day, and worked as a day-laborer until October 2, 1895; that while so engaged and working for defendant, he (defendant) negligently and wrongfully employed one Baptista Cavaleries, and others, whose names are unknown to plaintiff, to work for defendant, "as servants, for hire, in . . . the same line of work as the plaintiff was then engaged to perform, and that in the choice of the aforesaid servants the defendant wrongfully neglected to use ordinary or any prudence or care in their selection, but willfully, and with full knowledge of their unskillfulness, carelessness, and mental and physical unfitness for the work for which they were employed, engaged, and hired, without plaintiff's knowledge of the fact, or of their employment in his line of work, the above-named servants," etc. It is alleged that on October 2, 1895, while in defendant's said service, plaintiff was injured, through the negligence of the said servants, in the following manner: Plaintiff was engaged to tear down a building, and while he was at work removing the lath and plaster from the partition walls within the outer brick walls of the building, the said Cavaleries, and said other servants, "while under defendant's control and direction, and within the scope of

their employment, and without the knowledge of plaintiff, negligently, . . . precipitated said walls upon the person of plaintiff," thus injuring him.

The testimony of defendant, who was called as a witness by plaintiff, was, that he was the medical superintendent of the state asylum for the insane at Stockton; that one James Halliday was an outside attendant at the asylum, and had charge of the insane patients. Defendant testified: "The patients were put to work at various kinds of employment in and about the asylum, but I did not designate or select them myself. Whatever is to be done in a laboring way the patients generally take a hand in.—Q. They were under your authority, I suppose?—A. Well, of course, yes, under my authority in a measure; I did not select them myself." Referring to the work of tearing down the building, he testified, that the patients were taken out by those who knew them and handled them; that he did not designate the patients himself; that Cavaleries was one of the patients; "I was not present when the wall fell down upon Mr. Atkinson, and knew nothing about it until I was called to see him immediately afterward. James Halliday had charge of the patients who were working upon the building at the time. . . . The employees use their own discretion in taking out to work the patients that have been there a long time and are well known. Mr. Peterson, the foreman, has charge of the selection of the patients that are distributed about under the different attendants to go to work, and he receives them from the inside attendants. Peterson is one of the officers at the asylum."

It appeared that there were three parallel partition walls, about eight feet apart and twelve feet high, fastened at the ends to the outside brick wall and an inside corridor parallel brick wall. These partitions had been detached from the brick walls, preparatory to being torn down. Plaintiff was working on the south side of the south partition wall, and could not see what was being done on the north side of the north partition wall. Something caused the north wall to fall over on the middle wall, which latter was thrown over on the south wall, causing it to fall on plaintiff. Plaintiff testified that after he was taken out from under the *débris* he saw Cavaleries at the north wall, "with a crowbar in his hand, digging at the partition which had first fallen"; that "Cavaleries caused the wall to fall." The reason for so testifying, as he stated, was,

that Cavaleries was the first one he saw when he was released from under the wall, and Cavaleries was then standing with the bar in his hand, digging under the wall, and that there was no other person near at the time; the other patients were on the west side of the building. He testified that he did not know where Cavaleries was at the time the walls fell. From anything that appears, Cavaleries may have gone to the north wall after it had fallen. Plaintiff testified that he was hired by defendant, but that he (plaintiff) was working for the state and was paid by the state; that he knew he was working in a state insane asylum, and knew that the fellow-workmen were insane inmates.

It appeared that plaintiff had been working for two or three weeks alongside of these insane patients, on the same kind of work. There is no evidence that the inmates were known by the defendant to be, or in fact were, in any sense dangerous or unskillful; there is no evidence that they were unskillfully handled, nor, indeed, was it alleged as the fact, the allegation being that they were unskillfully selected; and there is no evidence of unskillful or imprudent selection of .these inmates; and there is no evidence that there were not enough attendants to see to the proper management of the inmates as fellow-laborers.

Without entering upon the discussion of the questions raised by appellant, it is sufficient to say that before the superintendent could be held liable, if at all, there should have been evidence tending in some degree to establish the truth of the allegations in the complaint. Defendant did not select the inmates for the work, nor did he have immediate control or direction of them; his control was general, and the immediate duty of selecting inmates suitable for the work, and the management of them when at work, devolved upon other officers of the asylum. Liability for their negligence cannot fall upon the superintendent, simply by reason of his general supervision of the asylum and its subordinate officers. Conceding liability at all, it could only arise, in such a case as this, where there is evidence of his negligence in selecting unskillful and incompetent subordinates, and that he was in some way culpable in allowing them to select the inmates for the work. But there is no evidence of incapacity of the subordinates, or that they were careless or unskillful in the selection of the inmates; nor is there any evidence that the inmates selected were dangerous

or unskillful, or that the accident happened through any un-skillfulness of officers or inmates.    There can be no presump-tion that the inmates were dangerous or unskillful from the fact alone that they were insane.

The judgment should be affirmed.

Smith, C., and Haynes, C., concurred.·

For the reasons given in the foregoing opinion the judgment is affirmed.          Temple, J., McFarland, J., Henshaw, J.